UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| DAVID RIVERA,<br><br>      Plaintiff,<br><br>vs.<br><br>SEA-WESTERN, INC., a Washington corporation,<br><br>      Defendant. | Case No.: 1:23-cv-00541-REP<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANT SEA-WESTERN, INC.'S MOTION FOR SUMMARY JUDGMENT (Dkt. 24)**<br><br>**PLAINTIFF DAVID RIVERA'S MOTION FOR SUMMARY JUDGMENT (Dkt. 25)** |

Pending before the Court are two motions: (i) Defendant Sea-Western, Inc.'s Motion for Summary Judgment (Dkt. 24), and (ii) Plaintiff David Rivera's Motion for Summary Judgment (Dkt. 25). Plaintiff seeks judgment on his claim under the Idaho Wage Claim Act for unpaid commissions allegedly "due" upon termination. Defendant disagrees and seeks judgment itself, asserting that under the parties' employment agreement and established practice, the alleged commissions were not "due" until a customer was invoiced. Having carefully considered the record and participated in oral argument, the Court denies both motions for the reasons discussed below.

**I. BACKGROUND**

This case arises from a dispute over unpaid commissions following the termination of Plaintiff David Rivera ("Rivera"), a former sales representative for Defendant Sea-Western, Inc. ("Sea-Western"), under the Idaho Wage Claim Act ("IWCA"), Idaho Code §§ 45-601, *et seq*.

Rivera was hired by Sea-Western on April 11, 2022 as a sales representative. Pursuant to a written employment agreement drafted by Sea-Western, Rivera was responsible for marketing

**MEMORANDUM DECISION AND ORDER - 1**

and selling firefighting equipment to fire departments from eastern Oregon to eastern Idaho. That agreement states in relevant part:

> **EMPLOYMENT AGREEMENT**
>
> The following outlines our mutual understanding of the employment agreement between SeaWestern Inc. (Company) and David Rivera, with a start date of April 11th, 2022.
>
> Salary:        Salary will be $5,000 per month; $2,500.00 paid twice a month on the 15th and the last workday of the month
>
> Commissions:   Commission paid on all sales in salesperson's territory, except for service work completed by other SeaWestern personnel. Commissions will be a percentage of applicable gross sales in employee's sales territory. Commissions are paid once a month on the last workday of the following month. Commissions are paid out one month in arrears. Commissions are not paid on shipping costs and/or sales taxes.
>
> We utilize a tiered commission rate to reward effectiveness.
>
> 0% Commissions for Sales of $0.00 to $500,000
> 1.5% Commissions for Sales of $500,001 to $1,000,000
> 2.0% Commissions for Sales of $1,000,001 to $1,500,000
> 2.5% Commissions for Sales of $1,501,001 to $2,000,000
> 3.0% Commissions for Sales of $2,000,000 +

The agreement neither defined the term "sales," nor did it specify any requirement that Rivera remain employed at the time a commission was paid.

Rivera's responsibilities included working with customers to generate sales orders. According to him, once sales orders were generated, other Sea-Western departments would fulfill the order and issue the customer an invoice for payment. The interplay between the sales order on the one hand, and the actual invoicing on the other hand, represents the crux of the dispute here.

On July 18, 2023, Sea-Western terminated Rivera's employment, citing "performance" as the reason for his discharge. At that time, several of Rivera's sales orders remained open but had not been invoiced. Rivera demanded payment of commissions on those sales orders, claiming that his commissions were "due" under the IWCA because he had completed all duties required

**MEMORANDUM DECISION AND ORDER - 2**

of him prior to his termination. Sea-Western denied the demand. Sea-Western contended that commissions were not "due" until a customer was actually invoiced and that its long-standing practice was to pay commissions only after such invoicing.

Rivera then filed suit In Idaho state court, alleging a single cause of action under the IWCA for unpaid wages. Sea-Western removed the action to this Court on the basis of diversity jurisdiction. Following discovery, the parties filed the pending cross-motions for summary judgment.

Rivera argues that the term "sales" in the employment agreement means "sales orders" and that commissions become "due" upon the issuance of the sales order. Accordingly, he claims entitlement to approximately $123,593.21 in unpaid commissions[1] from sales orders entered before his termination. Further, Rivera claims that Sea-Western's practice of delaying payment until after invoicing does not alter when commissions became legally "due" to him.

Sea-Western counters that "sales" means more than sales orders. Rather, Sea-Western argues that the clause in the employment agreement that commissions are paid in arrears established a condition precedent for a sale – namely, customer invoicing – and that commissions are not "due" until that condition is satisfied. The parties' subsequent course of dealing, Sea-Western says, confirmed this understanding. Thus, Sea-Western insists that Rivera's claim fails because none of the disputed sales were invoiced before his termination.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] Sea-Western challenges the accuracy of this figure, notwithstanding its legal arguments against recovery altogether. *See* Sea-Western's Opp. to Rivera's MSJ at 12-14 (Dkt. 28) ("Mr. Rivera has failed to support his damages request."). The correct amount of unpaid commissions is not material to the Court's consideration of the parties' arguments at this stage of the case.

**MEMORANDUM DECISION AND ORDER - 3**

56(a). The court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). The court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hannon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, courts must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, the court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment do not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.*, 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### III. ANALYSIS

The parties' cross-motions for summary judgment turn on a single, central question: when were Rivera's commissions "due" under the IWCA? Resolving that issue requires the

**MEMORANDUM DECISION AND ORDER - 4**

Court to determine (i) the scope and purpose of the IWCA; (ii) the governing principles of contract interpretation under Idaho law; and (iii) whether the record presents genuine disputes of material fact regarding the parties' intent and course of dealing. Because the employment agreement does not expressly define when commissions became due, and because the parties' differing interpretations of the agreement and Sea-Western's payment practices raise factual questions that cannot be resolved as a matter of law, the Court concludes that summary judgment is inappropriate for either party.

A.  **The Idaho Wage Claim Act**

The IWCA "governs an employee's claim to wages against a former employer." *Smith v. Kount, Inc.*, 497 P.3d 534, 537 (Idaho 2021). The term "wages" is defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece[,] or commission basis." I.C. § 45-601(7). A "wage claim" is defined as "an employee's claim against an employer for compensation for the employee's own personal services, and includes any wages, penalties, or damages provided by law to employees with a claim for unpaid wages." I.C. § 45-601(6). "Wages earned over a longer period of time [than one month], such as an annual bonus based upon net profits, will come due during a specific calendar month and are covered by the statute." *Manning v. Micron Tech., Inc.*, 506 P.3d 244, 248 (Idaho 2022) (alteration in original) (quoting *Paolini v. Albertson's Inc.*, 149 P.3d 822, 824 (Idaho 2006)). !! Furthermore, so long as an employer pays its employees a minimum wage for all hours worked at least once a month, the terms of any additional compensation may be negotiated between the employer and the employee. *Smith*, 497 P.3d at 537..

When an employee separates from his employer, the IWCA requires the employer to pay "all wages then due the employee" on the next scheduled payday or within ten days, whichever is sooner. I.C. § 45-606(1). In determining whether wages are "due" to an employee and thus

**MEMORANDUM DECISION AND ORDER - 5**

required to be paid under Idaho Code section 45-606(1), Idaho courts "often look[ ] to whether the employee is entitled to the wages for services rendered or whether there is more they must do in order to be entitled to the wages." *Savage v. Scandit*, 417 P.3d 234, 238 (Idaho 2018) (citations omitted). "If the employee was entitled to the commission at the time he brought the suit it would fall under the IWCA, if there was more that he was required to do then it would not." *Id.*

B.  **Interpreting Contracts in Idaho**

The primary objective in interpreting a contract "is to discover the mutual intent of the parties at the time the contract is made." *Credit Suisse AG v. Teufel Nursery, Inc.*, 321 P.3d 739, 746 (Idaho 2014) (quoting *Straub v. Smith*, 175 P.3d 754, 758 (2007)). The best indication of the parties' intent is derived from the language of their agreement. *Id.*

Whether a contract is ambiguous – *i.e.* reasonably subject to conflicting interpretations – is a question of law. *Id*. (citing *Bakker v. Thunder Spring-Wareham, LLC*, 108 P.3d 332, 337 (Idaho 2005)). If the Court determines a contract is unambiguous, its interpretation and legal effect are also questions of law; the Court then gives the contract language its plain and ordinary meaning within the four corners of the document. *Id*. But if an ambiguity exists and the parties' mutual intent cannot be understood from the language used, intent becomes a question for the trier-of-fact, to be ascertained in light of the extrinsic evidence presented at trial. *First Sec. Bank of Idaho, N.A. v. Murphy*, 964 P.2d 654, 659 (Idaho 1998).

C.  **Genuine Disputes of Material Fact Preclude Summary Judgment for Either Side**

    1.  <u>The Parties' Employment Agreement is Ambiguous</u>

The language contained within the parties' employment agreement is reasonably susceptible to more than one interpretation. It is therefore ambiguous and thus incapable on its own of supplying the legal justification for either side's motion as a matter of law. At issue here

**MEMORANDUM DECISION AND ORDER - 6**

is the agreement's reference to "sales" – specifically that "commissions [are] paid on all sales in salesperson's territory" and "will be a percentage of gross sales in employee's territory." Ex. A to Payne Decl. (Dkt. 24-7); Ex. G to Rosholt Decl. (Dkt. 25-10). Crucially, however, neither "sales" nor "gross sales" is ever defined.

Rivera contends that "sales" means sales orders because the sales order marks the customer commitment to purchase and the completion of the salesperson's work. *See* Rivera's Mem ISO MSJ at 7-9 (Dkt. 25-1). Under this view, commissions were "due" to Rivera when the sales orders were placed, regardless of when the customer was later invoiced – a task assigned to individuals other than Rivera. That is, Rivera argues that once a sales order was placed, his commission was fixed because there was nothing else for him to do, even if actual payment occurred later in accordance with Sea-Western's internal billing practices.

Sea-Western, by contrast, argues that "sales" necessarily refers to completed transactions, meaning the sales were not final until invoiced to the customer and, as a result, commissions were not "due" until that latter point in time. *See* Sea-Western's Mem. ISO MSJ at 8-13 (Dkt. 24-1) (additionally noting that Sea-Western paid Rivera's commissions for all sales that had been invoiced as of his termination). Sea-Western points to language in the employment agreement stating that "[c]ommissions are paid out one month in arrears" as evidence that commissions were contingent – and thus "due" – only upon invoicing. *Id*. at 2, 8-10.

The Court understands Sea-Western's argument as follows. The term "in arrears" is commonly understood as meaning "after a debt is due." *Id*. at 8. So, if commissions are "paid out one month in arrears," it follows that commissions are paid one month after they are *due*. Stated another way, commissions are due one month before they are paid; according to established company practice, this coincides with the timing of customer invoicing. Thus, Sea-Western divines customer invoicing as a condition precedent to the payment of commissions.

**MEMORANDUM DECISION AND ORDER - 7**

And because Rivera was terminated prior to the invoicing of the subject sales, he is not entitled to commissions on those sales.

But again, the employment agreement does not reference the terms upon which the parties' arguments rely. The words "sales order" and "invoice" are nowhere to be found, let alone any specific reference to invoicing being a condition precedent to a sale that warrants a commission. The agreement also contains no provision addressing the consequences of separation of employment. The absence of these terms leaves the parties' respective interpretations equally plausible: nothing explicitly ties commissions due to customer invoicing or requires continued employment through invoicing as a condition precedent to payment.

Because both interpretations find support in the employment agreement's language, the agreement is reasonably susceptible to more than one interpretation and consequently ambiguous as a matter of law.

2.  The Parties' Course of Dealing is Disputed

Because the employment agreement is ambiguous, its interpretation becomes a question of fact requiring the fact-finder to determine the intent of the parties at the time the agreement was drafted. *See Brown v. Perkins*, 923 P.2d 434, 437-38 (Idaho 1996). To that end, the parties' conduct in performing the agreement may shed light on how they understood the disputed language *ab initio*. *Id.*; *see also* IDJI 6.08.1 (in interpreting an ambiguous contract and the parties' intentions, the fact-finder may consider "[a]ny communications, conduct, or dealings between the contracting parties showing what they intended and how they construed the doubtful language"). But summary judgement is appropriate only when the course-of-dealing evidence is undisputed.[2] Here it is not.

---

[2] The cases that Sea-Western cites in support of this proposition only go so far in advancing their ultimate argument at summary judgment. *See* Sea-Western's Mem. ISO MSJ at

**MEMORANDUM DECISION AND ORDER - 8**

Sea-Western argues that the parties' course of dealing is undisputed and demonstrates that the parties understood invoicing to be a condition precedent to Rivera's entitlement to commissions. Sea-Western relies heavily on Rivera's own testimony describing how his commissions were historically paid. *See* Sea-Western's Mem. ISO MSJ at 3, 8-9 (Dkt. 24-1); Sea-Western's Opp. to MSJ at 3, 6-7 (Dkt. 28); Sea-Western's Reply ISO MSJ at 6 (Dkt. 32). For example, in response to questioning from Sea-Western, Rivera testified:

- "Q: When were the commissions paid? A: They were paid – once the product was invoiced, everything was good, you – it would come into your – you'd get paid. It would be in part of payroll. I don't recall if it was in the first check of the month or the second check. I don't recall." Rivera Dep. at 34:1-7, attached as Ex. A to Palmer Decl. (Dkt. 24-4).

- "Q: Okay. And after it is converted into a sales order, what happened next? A: Then someone in the office places the order. You kind of know in your head what dates it should be shipping. So, you know, you would advise the customer, if they asked, you know, 'Is it shipping?' 'Right now, it's 16 weeks,' and 'Right now, it's four months.' 'We have them in stock.' 'We're shipping it.' If they requested some kind of training on that product, you would schedule a time if it came up, but it didn't come up all that often. And then once it was, you know, invoiced and went through, then you knew the commission check was forthcoming." *Id*. at 36:6-21.

- "Q: Okay. And then after – after it's invoiced, that's when the commission is calculated? A: Then you see it on a sale that has been invoiced, and you know it's going to go into that breakdown of the percentages of which you got. And it was anywhere from – I would have to look at the – the commission structure again. But I believe you've been provided the documentation on that." *Id*. at 37:14-23.

- "Q: And did they cancel [a sale] after the sales order was already in place? A: They did. Q: Did they cancel it before the product had shipped and invoiced? A: Correct. Q: Were you the sales rep on this one? A: Yes, ma'am. Q: Did you receive a commission on that one? A: No, ma'am. Q: And why

---

8 (Dkt. 24-1) (citing *City of Boise v. Bench Sewer Dist.*, 773 P.2d 642, 646 (Idaho 1989) and *City of Meridian v. Petra Inc.*, 299 P.3d 232, 246 (Idaho 2013)). *City of Boise* did not involve summary judgment proceedings, nor did it confront a situation of contractual ambiguity. *City of Meridian* likewise dealt with a bench trial, not summary judgment. Still, the general point that subsequent course of dealing can possibly inform contracting parties' intent is well-taken, even if, here, the Rivera's and Sea-Western's later conduct falls short of definitely revealing their mutual intent at the time of contracting.

**MEMORANDUM DECISION AND ORDER - 9**

is that? A: Because they canceled before it was invoiced. Q: Was the process for earning a commission clear to you? A: Yes, it was. Q: Was there any confusion about the timing of when you would get the commission? A: Once it was – once it was shipped and invoiced, I would expect a commission would be coming. There was nothing in writing saying that you wouldn't get it for any reason. So, yes, once you saw it on the sales scorecard, and it was in – and it was into an invoice, you knew a check was coming." *Id*. at 53:2-54:2.

- "Q: When you were at Sea-Western, did you always get the commission after it was shipped and invoiced? A: Yes." *Id*. at 54:13-16.

- "Q: Do you remember that sale or … that portion of the sale? A: That would have been part of the entire Boise, Eagle, Star, smaller fire department opportunity. Q: Okay. And this invoice was sent after you left Sea-Western? A: Apparently. Q: About seven months later? A: Apparently. Q: Okay. If you were still employed at Sea-Western, when would you have been paid on this particular sale? A: I would have to – whenever I would get the – when they were invoiced. But it's not what I was charged with. I was charged with getting sales orders, which then I would anticipate commission based off of. I had no control over what happens from the time I get the sales order until the product is shipped unless somehow I'm pulled into it for various reasons. So I don't know. If you're saying that's what it is – but I – I don't know if they've changed policies. I don't work there anymore. Q: Okay. I'm just asking if you had still been employed at Sea-Western, when would you have received the commission for this invoice? A: It looks like this would have been in February. Q: So after the invoice was sent, your commission would have been calculated? A: Apparently. But again, I was charged with getting sales orders. That's a sales rep's job. Not to procure equipment, not to invoice customers, but to procure sales orders for the company, which I did and I did well." Rivera Dep. at 103:1-104:5, attached as Ex. A to Rosholt Decl. (Dkt. 25-4).

This testimony, says Sea-Western, proves that the parties shared an understanding that unless and until an invoice issued, no commission was due. *See* Sea-Western's Mem. ISO MSJ at 7-11 (Dkt. 24-1) (citing *Smith*, 497 P.3d at 539 (Idaho 2021)).[3] To highlight this point, Sea-

---

[3] *Smith* supplies useful guidance on the IWCA's distinction between wages "earned" and wages "due," but it does not resolve the dispute here. In *Smith*, the court enforced an explicit contractual condition precedent to receiving commissions – continued employment for 45 days after the close of a quarter. *Smith*, 497 P.3d at 536. No comparable express condition precedent exists here. Instead, Sea-Western argues that the parties' course of dealing effectively created one, tying commission eligibility to invoices rather than sales orders. *See* Sea-Western's Mem. ISO MSJ at 7-11 (Dkt. 24-1) (further arguing that Rivera's occasional responsibilities, such as

**MEMORANDUM DECISION AND ORDER - 10**

Western notes that (i) Rivera received commission credit for sales orders initiated by his predecessor, but invoiced after Rivera started work; and similarly (ii) that Rivera's successor received credit for sales orders initiated by Rivera, but invoiced after Rivera was terminated. *See id*. at 9-11 (citing Payne Decl. at ¶¶ 23-34 (Dkt. 24-6) (additionally commenting that "Sea-Western did not retain any sales commissions due to Mr. Rivera's termination")).

Rivera responds that this testimony shows the practice of how and when commissions were paid, not the parties' mutual intent, at the time of the execution of the employment contract, that invoicing was a condition precedent for such commissions to be due. *See* Rivera's Opp. to MSJ at 10-13 (Dkt. 27) ("The fact that the party may have, through a course of dealing, agreed that commissions would not be paid until the customer was invoiced – despite the lack of any language in the employment agreement referencing invoicing in relation to commissions – does not mean that course of dealing also reflects an agreement on when they were due."). He maintains that invoicing was a ministerial step handled by Sea-Western's administrative staff, not a contractual condition *he* was required to satisfy. *See id*. at 13-16. At bottom, Rivera emphasizes that his job was to generate sales; that after obtaining sales, he had done everything necessary to earn a commission on those sales; and that nothing in the employment agreement or in the parties' communications indicated that subsequent invoicing was a condition precedent to him being entitled to commissions. *See id*. (citing *Savage*, 417 P.3d at 234 (Idaho 2018)).[4]

---

training or troubleshooting, similarly shows that he had more to do after a sales order was placed, much like the employee in *Smith*).

[4] *Savage* and *Smith* (*supra*) align, insofar as both cases address whether anything else needs to take place before wages/commissions become due under the IWCA. But *Savage* does not answer that question (one way or the other) for our purposes because its procedural posture sharply limits its substantive reach here. *Savage* came before the Idaho Supreme Court on appeal from the dismissal of a complaint, not from a summary judgment ruling or a fully developed factual record. Accordingly, the court was required to accept as true the plaintiff's allegations that her commissions were due under the IWCA. *See Savage*, 417 P.3d at 238-39. In

**MEMORANDUM DECISION AND ORDER - 11**

Indeed, there is no undisputed evidence in the record that Sea-Western explicitly notified Rivera, prior to the execution of the employment contract, that invoicing was a condition precedent for commissions to be due. So, while invoicing typically marked when his commissions were paid, Rivera insists that they were not a bargained-for limitation on when such commissions were fundamentally due. *See id*. at 12.

These competing accounts of the parties' conduct reflect conflicting evidence regarding the parties' mutual intent and understanding at the time of contracting. Whether invoicing constituted a condition precedent to commission entitlement – as Sea-Western urges – or whether it merely reflected administrative payroll practices – as Rivera contends – is a question that turns on disputed facts and credibility assessments inappropriate for resolution at summary judgment. The fact-finder must determine, in light of the ambiguous contract and the contested evidence of how the parties performed under it, what the parties actually intended when they entered into the employment agreement. The parties' cross-motions for summary judgment are denied in this respect as well.

///

///

///

///

///

///

---

other words, *Savage* turned on the adequacy of the pleadings, not on a factual determination of when the at-issue commissions were exactly due. *See id*. at 239 ("While Scandit may be able to show later that the deal was not formally booked or that there were contingencies that prevented the booking, for purposes of a motion to dismiss … Savage has stated a claim under the Idaho Wage Claim Act.").

**MEMORANDUM DECISION AND ORDER - 12**

## IV.  **ORDER**

Based upon the foregoing, IT IS HEREBY ORDERED that:

1.	Defendant Sea-Western, Inc.'s Motion for Summary Judgment (Dkt. 24) is DENIED; and

2.	Plaintiff David Rivera's Motion for Summary Judgment (Dkt. 25) is DENIED.

Consistent with the Scheduling Order (Dkt. 12), Rivera's counsel shall contact Courtroom Deputy Brandi Fifer to make arrangements for setting the action for trial.



DATED:  December 3, 2025

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge